Filed 3/15/22  In re M.R. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re M.R. et al., Persons Coming Under the Juvenile Court Law. | C094365 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>A.R.,<br><br>        Defendant and Appellant. | (Super. Ct. No. STK-JV-DP-2019-0000311) |

A.R., father of the minors (father), appeals from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  Father argues the court erred when it found the beneficial parental

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

relationship exception to adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) He further claims the court incorrectly denied his request for a bonding study. We will affirm the juvenile court's orders.

BACKGROUND

The precipitating incident for this case occurred in July 2019, when J.G., mother of the minors (mother) tested positive for cocaine when delivering her daughter, I.R. Mother had received a similar test result approximately 18 months earlier, when she had delivered another daughter, L.R. In an interview at the hospital, mother denied she had used drugs and stated father, with whom she shared four children, M.R., A.G., L.R., and I.R., also did not use drugs. She also identified C.G., her son with a different father, who lived with his paternal grandmother.[2] Although mother and father had not obtained prenatal services or baby supplies while mother was pregnant with I.R., father had recently started working at Amazon and the two were planning to use his first paycheck to buy supplies. Mother stated she felt "overwhelmed" because she had to take care of the children by herself. She spoke to father but did not receive much help from him because he was working.

### 1. Petition and Initial Detention

On August 6, 2019, the San Joaquin County Human Services Agency (Agency) filed a section 300 petition alleging, among other things, a failure to supervise or protect minors C.G. (then nine years old), M.R. (then eight years old), A.G. (then four years old), L.R. (then 18 months old), and I.R. In particular, the petition alleged mother could not responsibly care for the minors because of her substance abuse problems, including her drug use during her pregnancies with L.R. and I.R., and untreated mental health issues. It also noted past reports of domestic violence between mother and father.

---

[2] The juvenile dependency case as to C.G. was dismissed and he is not a party to the case on appeal. He was also placed separately from the other minors.

In the detention/jurisdiction report, a social worker spoke with father, and father denied he or mother used drugs. As to previous social worker recommendations that mother go into drug treatment, father responded he did not "think it was a big deal" because mother did not "have enough [drugs] in her system to catch a case." The juvenile court ordered the minors detained on August 7, 2019. At the jurisdiction hearing, on August 29, 2019, mother and father submitted on the issue of jurisdiction and the court found the allegations in the petition true.

### 2. Disposition Report and Hearing

On October 8, 2019, the Agency filed its disposition report. In the report, mother denied any history of substance abuse and said she did not want services, although she noted she and father did not have enough space for all the children. Father similarly denied any drug use except for marijuana, which he used for pain management for a gunshot injury he received when he was 18 years old. He said he did not need to participate in a drug treatment program. A social worker noted the minors showed comfort in their parents' presence.

The minors had originally been placed with their paternal grandmother. Mother and father were told to stay away from the home so the Agency could supervise visitations, but mother and father then colluded with the grandmother to retrieve the minors. The Agency took the minors back and placed them in a different foster home.

The caregiver noted several concerns with the minors. When the minors first arrived, they were very concerned about food and always tried to make sure there would be food to eat, suggesting previous food insecurity. M.R. had deficits in his educational level and had scored poorly on reading tests. He initially slept on the floor at the caregiver's home because he was fearful of gunshots and strangers coming into the home. He said when he was living with mother and father, he would hear gunshots and "random people" would come into the house and take things, although the caregiver noted that M.R. would sometimes lie. A.G. had speech and cognitive development deficits. Both

3

M.R. and A.G. also had severe recurrent nightmares involving "bad people" or "strangers coming into the home." A.G. said that "someone touched her" and indicated her vaginal area, but did not provide further details. A school psychologist noted A.G. had wandering eyes and was unable to focus, and was concerned she had been shaken as a baby.

L.R. was nonverbal, but also had severe nightmares every night. She had a "profound fear of men" and would become upset when approached. When the caregiver attempted to change her, she would clench her legs together, so the caregiver had to wash her in a bath to clean her. An Agency social worker opined that these all indicated lack of adequate supervision with mother and father.

Mother and father had supervised visits with the minors twice per week for an hour each time. Father was interactive with the minors and engaged appropriately during the visits. Mother was having difficulty in the visits in that she was "regularly on her phone" and would make unrealistic promises to the minors. Father's visits were described as "more significant" and "more interactive" than mother's.

Neither parent participated in any services. Father said he did not need services and the Agency was not able to schedule a child and family team meeting because of difficulties scheduling with the parents. Father explained he was not the primary caregiver of the minors and worked long hours. A social worker visited mother and father's home and found them living in a small back room attached to a house. The social worker stated the home was inappropriate for the minors to live in. The Agency recommended reunification services for father.

On October 28, 2019, mother and father submitted on the reports and the juvenile court ordered reunification services for father, including participating in drug court and drug testing.

### 3. *Status Review Reports and Review Hearings*

The Agency filed status review reports on March 17, 2020, and May 27, 2020. One report elaborated on A.G.'s statement that "someone had been touching her" when she lived with mother. Each time A.G. made such a statement, M.R. would interject and say that nobody had touched A.G. and that she was lying. A.G. also said that when she was living with mother, "random men would come into their house at night." She recounted a time she was scared because someone was shooting at the house and people were screaming. M.R. stated father had guns for protection, but later said father got rid of the guns. As to L.R.'s behavior, the report noted L.R. would be social during the day, but would become fearful of the caregiver's husband at night, so the husband would sleep in the living room. Father denied that anything had ever happened to A.G. and L.R. while they were living with him and mother, but said that mother was their care provider when he was at work.

M.R.'s teacher reported M.R. was easily distracted and would worry about things going on outside of school, and suggested M.R. needed counseling to process trauma before he could focus on academics. M.R. suffered from anxiety and depression, and displayed sexualized behaviors when he was first placed in his foster home, although the behaviors had decreased over time. A.G. had similar problems with sexualized behaviors, which were decreasing. M.R. and A.G. reported recurrent nightmares involving a person with a mask and blood. A.G.'s IQ tested under the normal range. L.R. was struggling with anxiety and had "nightmares almost every day and especially after her visits with [father]." Her general fear of men had calmed down after being placed in the caregiver's home. Overall, the minors appeared comfortable in the foster home.

Mother's whereabouts were unknown and she had not participated in reunification services. Father was admitted to an outpatient drug treatment program on October 31, 2019, but tested positive for cocaine on January 6, 2020, and positive for cocaine and

5

alcohol on January 31, 2020. He was terminated from the program for unexcused absences. He tested negative on February 5, 2020, and entered a residential drug treatment program on February 19, 2020. Father was referred to individual counseling, but did not get in contact with the counselor. He was waiting for parenting classes to start. Father was receiving consistent supervised visits with the minors twice a week for an hour each, although M.R. had refused to attend visits. M.R. did not explain why he did not want to visit with father. Although father's progress in services had been minimal, the Agency recommended giving him additional time to show his commitment to reunification.

At the six-month review hearing, on June 2, 2020, the court noted the minors had been transitioned to a new foster home because of capacity problems with the first foster home. While acknowledging that father had "some work to do," the court commended father for "hanging in there" despite various COVID-19 related changes and encouraged him to "[k]eep it up." The court continued father's reunification services, but terminated services for mother.

On August 14, 2020, the Agency filed a status report. The minors had been moved to a third foster home because the paternal grandmother had shown up at the second foster home unannounced and threatened the foster parents. M.R.'s new caregiver did not report any concerning behaviors, although he seemed to have some anxiety.

Father was still in his residential drug treatment program, had completed his parenting program, and started individual counseling. The counseling notes reflected that father was "guarded, withdrawn, and appears distrusting of the therapeutic process." He acknowledged his substance abuse, but minimized his use as well as triggers, and lacked "readiness to process the dynamics of the relationship between himself and the mother of his children." In later visits, he developed stronger insight into the impact substance abuse could have on his parenting ability and expressed frustration about interruptions in

6

his visitations because of the minors' housing changes. He had concerns about his bonding with the minors because of his lack of visits. The Agency recommended the continuation of reunification services for father.

At the 12-month review hearing, on September 8, 2020, the Agency reported father had been terminated from the residential drug treatment program because of a positive drug test for opiates and morphine on August 2, 2020. The Agency thus changed its recommendation and recommended terminating father's reunification services. Father was not present for the hearing and his attorney had not been able to contact him. The court terminated father's reunification services.

*4. Section 366.26 Report and Hearing*

On December 17, 2020, the Agency filed a section 366.26 report. Father continued to receive supervised visitations once a week and had been consistent in making his visits. The likelihood that the minors would be adopted was very good. A.G., L.R., and I.R. had been placed with a foster family since July 2020 and had "developed a healthy relationship" with their caregivers. Both A.G. and L.R. said they were happy living with their caregivers. M.R. had been placed with his caregivers since October 30, 2020.[3] M.R. had adapted well in the home and was developing a relationship with his caregivers. M.R. said he liked his current placement. The Agency observed that the minors had a relationship with father, but thought the benefits the minors would receive from having safe and stable homes outweighed the loss they would feel from termination of father's visits. Thus, the Agency recommended termination of mother's and father's parental rights.

---

[3] M.R. was not placed with his sisters because of "inappropriate sexual behaviors."

On December 30, 2020, the court continued the section 366.26 hearing, and father requested a bonding study. The court continued the request to the next hearing because not all counsel were present.

On January 25, 2021, the Agency filed another status report, noting the minors had developed relationships with their respective caregivers and M.R.'s caregivers had been approved in an adoption home study. Father had continued with his once weekly visits.

At a hearing on February 3, 2021, father repeated his request for a bonding study. The court rejected the request, saying, "I'm not going to grant that at this point." Approximately a month later, father filed a written motion requesting a bonding study. In the motion, father argued the reports submitted to the court made "clear there is a bond between [f]ather and his four children," and that a bonding study would be important to show the impact of severing that bond. The Agency opposed the motion and filed a declaration by an adoption social worker, who stated M.R. had told her he would like to be adopted and described his visits with father as "[m]eh," "[o]kay," and "[g]ood." M.R. had never requested additional visits with father. The opposition brief highlighted the facts father had not previously been active in parenting the minors, had been absent for much of the younger minors' lives, and that the minors showed significant signs of trauma from their time living with mother and father. The Agency also argued the request was untimely because the court had first set the section 366.26 hearing on September 8, 2020, and father had not filed a motion until March 2021.

On April 30, 2021, the juvenile court held the contested section 366.26 hearing. As an initial matter, the court denied father's request for a bonding study, noting that father had only presented "allegations and comments" suggesting the need for a study, rather than evidence, such as a declaration from father. The court also noted the motion was untimely, in that the "initial .26 hearing for December was set on September 8th of last year," but that more than six months had passed since then.

8

As to the issue of parental rights, father called M.R. to testify. M.R. testified, outside the presence of father, that his weekly visits with father were "[g]ood," and his sisters were "[r]eally happy" when they saw father. When they visited, M.R. would play with his sisters and father would play with them a "little bit." M.R. did not remember what he used to do with father when they lived together, but he thought they played Call of Duty. He said he still wanted to see father and would be "[v]ery sad" if he never saw him again. If M.R. had to pick whether to go home today with father or with his foster parents, he would choose father.

On cross-examination, M.R. stated that during father's visits, he would play with his sisters on the ground while father sat on a couch and watched them or television. Father would sometimes get on the ground and build blocks with them. When father missed visits, M.R. felt "[k]ind of sad" for "five minutes or ten." When M.R. lived with mother and father, mother did most of the cooking and took him to school, and both parents helped him with his homework or helped him when he was hurt. In his current placement, if he got in trouble at school, needed help with homework, fell down and hurt himself, or had a disagreement with his friends, he would ask his current caretakers for help. If he was not able to go home with father, he wanted to stay with his current caretakers. He said he would be sad if he did not see father anymore because he "[s]ometimes" worried whether father was "okay." He was scared to testify and worried he might hurt father's feelings.

Father also testified on his own behalf. Father stated that when the minors were living with him and mother, mother would cook their meals and he would take them to school. The minors would come to father or mother when they had nightmares, which father attributed to scary movies. He acknowledged missing two or three visits with the minors over the past two years, including one for his uncle's funeral. The minors were always happy to see him during visits. Father described his relationship with the minors as strong, saying that if he wasn't around, it was only because he had to be out working.

9

On cross-examination, father acknowledged that M.R. could put the feelings of others over his own feelings. Father denied any knowledge of mother's cocaine use when L.R. was born, but recalled he had previously agreed to a safety plan that involved contacting the Agency if there were any problems. After L.R.'s birth, father talked to mother about her cocaine use, but he never contacted the Agency because he thought the Agency would abuse its power. He admitted that he kept cocaine at the house and used it about 20 times a week. Father attributed his positive drug test from September 2020 to poppy seeds he had eaten in the treatment program.

As to the minors' needs, father thought M.R. had ADHD (attention deficit hyperactivity disorder) and L.R. had a speech delay. Father attributed his daughter's sexualized behaviors to a misunderstanding that involved her touching herself because she needed to urinate. Father denied any gun violence when the minors lived with him and mother and denied reports that the minors slept on the floor in foster care because they were worried about gunshots. He stated A.G. and L.R. may have been afraid of men because he always kept men away from them.

At the conclusion of the testimony, the Agency argued M.R. appeared to be more concerned about his father's feelings, rather than his own situation. Minor's counsel agreed with this assessment. The Agency concluded that the burden of proof for establishing any statutory exception was on father, and that he had not met that burden. The court agreed, found it likely the minors would be adopted and that no exception to section 366.26, subdivision (c)(1) applied, and terminated parental rights.

Father filed a timely notice of appeal from the orders terminating parental rights.

DISCUSSION

I

*Beneficial Parental Relationship Exception*

Father argues the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. In particular, father points to M.R.'s

10

testimony and asserts it proved the minors would be "harmed by the severance of their relationship with their father," such that "the preference of adoption was overcome and [f]ather's rights should not have been terminated." We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(1) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) For the beneficial parental relationship exception to apply, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

11

"In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) On the other hand, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C., supra*, 11 Cal.5th at p. 634; *In re Autumn H.*, at p. 575.) The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, at p. 576.)

The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.) The specific elements of this statutory exception require a close examination of "the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id.* at p. 626.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) "[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

12

Here, both parties acknowledge father maintained regular visitation with the minors. The analysis thus turns on the latter two elements of the exception: whether the minors had a "substantial, positive, emotional attachment" to father, and whether termination of that attachment would be detrimental to the minors balanced against the benefits of a stable, permanent home. Father primarily points to his record of consistent visits and M.R.'s statements that he liked visiting with father as evidence of his bond with the minors. However, father acknowledged he was not the minors' primary caregiver, and mother complained of feeling overwhelmed because father's work meant that he did not help her take care of the minors. He testified M.R. was "[a] little hyper" while M.R. actually suffered from depression and anxiety and said A.G. did not have any special needs, even though her school had noted she had possible speech and cognitive deficits and a school psychologist suspected she had been shaken as a baby, suggesting father did not fully understand the minors' needs.

Although M.R. testified the minors were happy to see father during visits and sad when the visits ended, there is little evidence to indicate separating the minors from father caused emotional trauma for the minors. M.R. had previously given other statements indicating indifference to the visits and had sometimes refused the visits, supporting the Agency's contention that his testimony at the hearing was given out of concern for father's feelings, rather than genuine expressions of his thinking. At least some evidence also suggested the visits could be negative; L.R. appeared to suffer from recurrent nightmares that coincided with father's visits. Finally, the two youngest minors, L.R. and I.R., had spent little to no time living with father, and thus would not have formed a substantial bond with him despite the consistency of his visits. "Even frequent and loving contact is not sufficient to establish" the beneficial parental relationship exception "absent a significant, positive emotional attachment between parent and child." (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.)

13

Moreover, there was evidence to conclude the minors would benefit from stable placement in their respective adoptive homes. When the minors were initially removed from parents' custody and placed with other caregivers, they showed a number of unmet needs. For instance, three of the minors suffered from severe, recurrent nightmares, which M.R. and A.G. said involved intruders in their home, and people with masks and blood. Similarly, A.G. told her caregiver that "someone touched her" while she was living with mother and father, and indicated her vaginal area.[4] Caregivers also reported sexualized behaviors by both M.R. and A.G., and a fear of men by L.R.

Once the minors were placed with other caregivers, they began receiving regular medical care and treatment by mental health professionals. After some time in their out-of-home placements, the minors showed improvement and it was possible to discontinue some of the mental health services. The minors were also faring well in their prospective adoptive homes, having "adapted well," bonding with their caregivers, and stating they were happy with their living conditions. While father is correct that the minors' bonds with their current caregivers do not categorically preclude application of the beneficial parental relationship exception, they are a relevant consideration in the analysis. (*In re Autumn H., supra*, 27 Cal.App.4th at pp. 576-577.) Even assuming father established he had a positive relationship with the minors, he did not show that losing the relationship with him would harm the minors "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.)

Father further argues the juvenile court misunderstood the scope of its discretion because, in father's recounting, the court "said it had no discretion other than to do what the Agency recommended." The court's actual statement, that it was "not in a position to do otherwise than to proceed with the [Agency's] recommendation," followed statements

---

[4] Father dismissed these reports, attributing the nightmares to scary movies and the potential sexual abuse as a simple misunderstanding.

14

by the court that father had the burden of proof "to prove that one of the exceptions applies," and that the court had not heard "enough evidence to find that . . . one of the exceptions applies." Thus, in context, the court was simply stating that it could not find in father's favor because he had not met his evidentiary burden. The court's explanation of father's burden was an accurate statement of law and we see no indication that the court misunderstood its responsibility. (*Caden C., supra*, 11 Cal.5th at pp. 636-637.) The juvenile court did not err in finding the beneficial parental relationship exception did not apply.

II

*Bonding Study*

Alternatively, father argues the juvenile court erred when it declined to order a bonding study for father. In particular, father argues his request was timely and the court's denial precluded him from obtaining evidence he could have used to prevent the termination of his parental rights. We disagree.

Under Evidence Code section 730, a court may appoint an expert to study the bond between a parent and a child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights, however. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) Thus, the juvenile court has broad discretion whether to order a bonding assessment. (*Id.* at pp. 1339-1340; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) The question on review is "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*In re Lorenzo C.*, at p. 1341.)

"The kind of parent-child bond the court may rely on to avoid termination of parental rights . . . does not arise in the short period between the termination of services and the section 366.26 hearing." (*In re Richard C., supra*, 68 Cal.App.4th at p. 1196.) When the juvenile court makes a determination of the nature and quality of the parent-

child bond, the child generally has been in the dependency process for a significant period of time, and the characteristics of the bond should be apparent. (*Ibid*.)

The court initially set the December 2020 section 366.26 hearing on September 8, 2020, when it terminated father's reunification services. He then orally requested a bonding study on December 30, 2020, and the court deferred the request until all counsel could be present. Father renewed his request on February 3, 2021, and the court told him it would not grant the motion at that point. Father proceeded to file a short written motion on March 18, 2021, which argued an expert was required to "assess the bond between [father] and his children" to "give the Court insight as to whether or not termination of parental rights is in the children's best interests." The court then denied the request on April 30, 2021, saying the request was untimely and father had not presented any evidence of the need for a study.

Father argues the request was timely because he received the Agency's section 366.26 report on December 17, 2020, and only then had notice that the Agency was recommending termination of his parental rights. And, he suggests, it was the court that delayed the resolution of the motion, rather than his own actions. But father's reunification services were terminated more than three months before he first raised the possibility of a bonding study, and he would have known that the bond between him and the minors would be at issue once the court set a hearing under section 366.26. The orders issued following the September 8 hearing also expressly informed father that the section 366.26 hearing could result in termination of his parental rights. Nor does father's reasoning explain why he did not file a written motion until March 18, 2021, more than six months after he had notice of the section 366.26 hearing and three months after the Agency's section 366.26 report, which purportedly prompted father's initial request. (*In re Richard C., supra*, 68 Cal.App.4th at p. 1197 [denial of request for bonding study made one month after receipt of social worker's § 366.26 report as

16

untimely was "fully consistent with the scheme of the dependency statutes, and with due process"].)

We similarly disagree with father's argument that the court unnecessarily hamstrung his efforts to show evidence of his bond with the minors. When the court denied the request, there was evidence of the bond between father and the minors in the form of Agency reports stretching from August 2019 to January 2021, which contained the opinions and recommendations of Agency social workers and descriptions of supervised visits with father. The minors' wishes were made clear through their statements or through the statements by their counsel. Father spoke about his relationship with the minors when he testified and in his individual counseling sessions. Given the substantial amount of information before the court, we are not convinced that a bonding study was necessary for the court to make a decision. The trial court did not abuse its discretion when it denied father's request for a bonding study.

DISPOSITION

The juvenile court's orders are affirmed.

/s/<br>EARL, J.

We concur:

/s/
HULL, Acting P. J.

/s/
ROBIE, J.

17